We'll hear argument next in Research Corporation Technologies Incorporated versus Eli Lilly and Company. And we'll hear first from Ms. Murphy. Thank you, Your Honor, and may it please the Court. Erin Murphy on behalf of Eli Lilly and Company, and I'm going to endeavor to save three minutes of time for rebuttal. When Eli Lilly and Philips entered into a licensing agreement back in 1990 for Lilly to use Philips' PICIA technology, they carefully distinguished between two potential uses, using a PICIA expression system to produce a pharmaceutical product and using PICIA technology to produce reagent, which the agreement defines as material used in the manufacture of pharmaceutical product. The parties defined the terms product and reagent quite differently, and they laid out different payment schemes for Lilly's use of one versus the other. One of the things that's striking about the language is that there does not appear to be an authorization to use the reagent for a commercial purpose. The reagent is authorized to be used for research purposes or to be sold, but there's nothing about using it for the production of any product. So what significance does that have? Does that mean that all of the conduct was ultra-virous and unlicensed? That was certainly RCT's argument for two years of this case. They argued that because there's not explicit language in the agreement that authorizes it, we were acting wholly outside the scope of the agreement and that they could get a different type of damages that was not controlled by the agreement. They decided to abandon that argument two years into the litigation and instead proceed with the argument that all along it turned out we really were making product with the reagent, even though they had expressly and explicitly argued repeatedly that we were not doing so. What would happen, I mean at this point, are all of the other claims in the case just gone forever so that if we were to conclude, I'm just speaking hypothetically out loud so I understand the decision tree, if we were to conclude that this did not qualify as product, that the case would then be over even though there had been unlicensed use for years? The parties entered into a settlement that led to the dismissal of various other counts and there were distinct breach of contract theories and they dismissed the counts that had other theories in them and the one that was kept alive. All the chips are on the question of whether this use of CPB in the process of manufacturing. We wouldn't remand then if we, the case is going to be? So I think that there's essentially as I see sort of the decision tree, you know, you can affirm, you can say, you can reverse and say we are unambiguously correct about how to read the agreement or there's the possibility that this court looks at it and answers the de novo question of whether the agreement is unambiguous by saying no, it's ambiguous and then at that point either you reach in the first instance or you remand for the district court to resolve the question of how to resolve the ambiguity. In light of the evidence, the parties put forward on both sides about the drafting history and the negotiation process that happened here. But I think the ultimate, you know, the key question for this court first and foremost is, is what is the is there an unambiguous reading of this agreement as to the use of product? And if so, is it our reading or is it the reading that the district court? The question that I have for you is that if the term reagent means a material produced using the expression technology and which is used in the manufacture or development of product, that would seem to suggest that reagents can be used then, this is one instance of use, to make product, that that's an authorized use of a reagent to make product. But it seems under your reading that that's a null set. It's actually not. I mean, we actually took the position below in conjunction with the piece of the claims that aren't in the case anymore that we thought that you could get that you can use reagent either to make capital P product, the type that's covered by the agreement, or to make product generally. And we took the position not all product is capital P product is end product under the agreement. Again, that that was exactly the dispute the parties were having below. And what we argued is it's very clearly a capital P. And we did it is contract means that it's the defined term of our again. So what we argued, again, like all of this is relating to a claim that's not in the case anymore. But what we argued is we argued that the term the definition of reagent was ambiguous and that that use of the capital P product, our position. And we actually are the ones who inserted that language into the agreement is that it was a mistake and that we actually always intended to compensate them, regardless of whether we were using reagent to make capital P product or to make a product that was outside the scope of the agreement. So that was our position about reagent in the context of the dispute about whether it was like the if the product in order to be product has to be directly produced by the expression system. How could a reagent ever be used in. In the making of that. Oh, exactly. As it's used here, which is the expression system is producing the precursor proteins that are ultimately is producing the material that's ultimately refined into the active pharmaceutical ingredients. And just to be clear about this, because I think the district court really misunderstood. We were never arguing and we're not arguing now that produced by means you have to produce the actual active pharmaceutical ingredient. We argued repeatedly below that our drugs are produced by an E. coli system, even though we be very clear that our E. coli system does not produce the active pharmaceutical ingredient itself. It produces material precursor proteins that are refined using C.P.B. into the ultimate active pharmaceutical ingredient. The expression system produced the precursor and the reagent, and then the reagent was used with the precursor to produce the product. Then it would fit both. Definitely. That could be a scenario where you would have double recovery because we are both producing. We're producing it the way I find it helpful to think about the material. We're producing two types of material. We're producing precursor proteins that is material that ultimately ends up in the end product, and we're separately producing a reagent that does not end up in the end product, but is used in the process of manufacturing the end product in getting it from the precursor protein material to the ultimate API. And so our position has always been that you don't have to be producing the fully formed API. It's that you have to produce material that is part of the end product rather than material that's just useful in the production. And I think you get there principally by looking at it. I mean, we think that's the ordinary and certainly technical understanding in this industry of the term produced by an expression system. One place you see that is in our FDA approved labels for our drugs. They say it's produced by an E. coli system, not by a PICU system or not by the combination of an E. coli system and a PICU system, even though the FDA is well aware that the way these particular drugs are manufactured is the E. coli system produces the precursor protein, and CPB is then used along the way to get from precursor to API. Yet nonetheless, they've been perfectly happy with us to have labels that say produced that our medicines are produced by an E. coli system because they understand that terminology the way we understand it, the way that Phillips understood it. If you look at page 1060 of the record when there's some contemporaneous documentation of how the parties understood this concept, when we said to Phillips that we were interested in using the PICU technology to make reagent, and so the question arose about how would we pay for that under the agreement? What Phillips said was that the pass-through royalties available for end product would not be applicable on something developed as a reagent which was never part of the final product. So Phillips itself understood at the time that the key distinction for whether something is end product under a licensing agreement that Phillips itself drafted is whether the material that you're using the PICU expression system to produce is, quote, part of the final product. And there's no dispute here that the CPB that we're using in the manufacturing process is not part of the final end product of our diabetes medicines. It's just something that's used in the manufacturing process of getting the material that is there from point A to B, from precursor protein to ultimate active pharmaceutical agreement. And if you understand all of this that way, then it makes sense that the agreement has distinct definitions for end product produced by an expression system versus a definition for reagent that focuses on whether you have material that's produced by an expression system but is used in the manufacture and development of product rather than actually found ultimately in the end product itself. So we think that reading is consistent with the plain text. It's consistent with the ordinary understanding in the industry, which you see again from FDA labels. We pointed to evidence in our briefs about how Phillips used this terminology not just in our negotiating back and forth, but also in its own kind of discussion, its own memorandum describing how it used, how the PICIA expression system could be used. And it also is, it happens to be exactly the way RCT said that these terms should be understood for two years. And that's not because they didn't understand how we were using CPB or how we were manufacturing our medicines. If you look at page 930 of the record, there's a letter that we sent to them all the way back in November of 2015 before this litigation even started. And in that letter, we told them, first, we're using CPB in the process of manufacturing these three medicines, identified them by name. Second, these are, we told them what the active pharmaceutical ingredients in those three medicines are. Third, we told them that we use the E. coli system not to synthesize the ultimate, you know, that doesn't spit out the fully formed API. We specifically said we were using the E. coli system to synthesize the precursor proteins. And then we explained what we were doing with CPB. And we said we're using it to trim off amino acids along the way in an intermediate form of the proteins from the precursor to the ultimate version. So they had all of those facts about exactly how we were manufacturing our drugs, exactly what the E. coli system was doing, and exactly what we were using CPB for. Yet they nonetheless said in four complaints that Lilly produced the APIs themselves with an E. coli expression system, which is, of course, what we have been saying from day one in this litigation and even before it started. It has always been our position that that is the use to which we put CPB. That is a use that would implicate the contract's terms about reagent, but it is not a use that entitles them to a 2 percent royalty revenue stream off of drugs that we were making long before their expression system ever came onto the scene. If I may, I'd like to reserve the remainder of my time. Thank you, counsel. We'll hear next from Mr. J. Morning, Your Honors. May it please the Court. William J. for RCT. The basic submission from the other side is that they got something without having to pay for it. That something is what you, Judge Collins, referred to in your question, which is the right to use reagent commercially without paying any compensation. If we got into the negotiating history, you'd see that that type of grant was expressly stricken. That raises the same question I asked your opponent, which is, do you agree, just for purposes of understanding the decision tree, that if the conclusion is that this was an unlicensed use that was just outside the authorization of the contract, that that claim is gone and the case is over, that it doesn't count as product or reagent, and it was just an unauthorized use of reagent? Right. If the conclusion were that no royalty was owed, but that compensation would have to be on some other theory, then yes. But I think that the reason that we're having this discussion about what a product is and how reagent fits into the structure of the agreement is to understand whether under the agreement, in other words, under the royalty provisions, the use of reagent to produce product results in compensation under the royalty provisions. And I mean, the challenge I'm having with the language is that, you know, 1.3 uses the phrase directs the production of a product and 1.5 uses which is produced by an expression system. But 1.8, the definition of reagent says used in the manufacture or development of, which is a much seems like a broader phrase than produced by or directs the production of. Can you address that issue? I can. And I think that one reason for it is that if you look at the at 1.8, the definition of reagent used in the manufacture or development of product or used for research purposes, it also has to be produced using the expression technology, which is a slightly broader set of knowledge and know-how than just the expression system. So that that's why what we write. But if everyone agrees that if that if. Tell me if you do agree with this, that if the product had been lowercase p and said a product, this would be a reagent, correct? Then the other side, I think, would agree. Everyone would agree that this was material produced using expression technology and was used in the manufacture development of a product. The question is whether or not it is product. That's right. As product, it has to be produced by the expression system or the expression system has to direct its production. Well, I want to I want to caution about the direct directs its production language, because recall that that is directs the production of product or reagent. So no one disputes that this reagent was satisfies that aspect of the definition. Was it this was it was the production of CPB is directed by the system. That's correct. That's correct. But when you get to one point five and it says produced by. And it is a product produced by an expression system. That seems to suggest that the same relationship in one point three between product and production is being referenced. Am I wrong? I think I disagree with that, Judge Collins, because, first of all, it's it's different words. Second, because the expression system can direct the production of product or reagent. And then if the reagent this is gets back to your colloquy with my friend on the other side, if the reagent is what enables the production of the end product, that is product that was produced by the expression. These are only examples. Suppose you have a recipe and you put everything together. And then the next step in the recipe is to put it through a colander or a sieve to get out certain materials and only have what passes through the sieve. Would you say that that, you know, that, you know. Food, whatever it was that had been produced, would you say that that was produced by the sieve? I mean, you would say that it was prepared using the sieve, but to say it was produced by the sieve seems unusual. In the example that you're giving, it seems like all of all it's doing is is removing some stuff and not making and not making any change. So it might not be the but for cause of the finished product. I do think like if we're going to stick with culinary examples, there's nothing at all untoward about saying that a loaf of bread or a cake was produced by the oven that baked it. And nothing from the oven winds up permanently in the in the finished product. So the other sides remember that the other side is trying to make this textual argument that the ordinary meaning of produced by is that the that something that came out of the system must end up in the finished product. That is not the form of words that the definition here uses. And I think the reason why instead it's tied to capital P product in the definition of reagent and also in the compensation provision for cost savings, that the other side is relied on to say, oh, no, no, we're not trying to pay nothing. Look at the cost savings provision. It, too, uses capital P product. And I think the use of capital P product in both of those places is incredibly significant because it fits with the overall structure of this agreement. There's no right to use reagent commercially except for the production of product. Why not? Because the royalty structure is set up so that you pay a royalty at the end of the chain. If you use the expression system to make reagent and then bulk product and then end product, you pay a royalty on the end product. If you use it to make bulk product, you pay royalty on the bulk product. If you use it to sell the reagent itself, you pay royalty on the reagent. But there is always going to be a royalty obligation. That's why in the final draft, really in between the final draft and the one before Phillips added the capital P product to the cost savings provision to say that the only compensation is owed if the use of reagent results in savings in the manufacture of capital P product. So the upshot of that, I think I took my friend on the other side to say that capital P product is a defined term. That means that they think they owe no compensation for the commercial use of reagent to produce something other than capital P product. This that's not the right way to understand this agreement or the capital P product. I see that argument that that would make no sense to read it that way. But what about the alternative reading that it simply was an unauthorized use? Then it makes perfect sense that there isn't an associated royalty provision because it wasn't authorized. I think that that would attribute a lack of care to the drafting that just doesn't is not borne out by the history or the structure. And so the point that I made a moment ago, I mean, it's striking. They wanted and they asked for a broad use for reagents provision and Phillips wouldn't give it. And it's very clear that it's it's omitted from the document. And then the only use that seems to be allowed is this narrow use to make product. But it didn't change the definition of product. Oh, no, that's right. It didn't change the definition of product, which was drafted, which is which comes from. But it would also suggest if the original definition of product was left, that everyone understood that that didn't include. Use of reagent, because then why was this whole discussion about using reagents? The reason for the discussion about using reagent is so they could sell reagent separately. And also so that you remember that the research use is plugged into the into the reagent definition as well. So it's something that is made by the expression system and used for research purposes is also defined as reagent. So if we pretend that we had just signed that they just signed the original template license with the original definition of product, this would be a product because it would be a substance is produced by the expression system. And that winds up being a but for cause of the ultimate end product. They guess it's true that has done here. The expression system has directed the production of the product. I don't but I don't think that's necessary because I'm resisting the premise of the question you asked me a few minutes ago. In order to agree with you, we would have to find that the phrase directs the production of a product means something different from product produced by an expression system. Is that correct? That's basically right. Because the the reagent directs the production of product or reagent means that the definition of expression system encompasses the part of the directing the production of reagent. That's closer to the to employing the language, the sort of technical language about expression systems. And if the other side could show that there were such technical terms in the definition of product, they would have a stronger argument. That's why they I mean, they argue they tried to make that argument below to say that produced means expressed. And now they have a further refinement of that argument that says, well, produced means expressed a little bit. I take that. I take them to be acknowledging that something can be produced by multiple causes. In other words, they give they give a number of examples throughout both their opening and reply briefs, including, I think, at pages thirty one to thirty four in which they say that, you know, a part of the of the end product must be produced by the by the by the system in the sense in which they use it. I think that's acknowledging that the end product can be produced by more than one source. So a number of the of the straw men that they've set up, I think, fall away because once you understand that aspect of their position, their previous position was that the whole thing is going to be produced by the by the expression system. And to circle back to their acknowledgement that you really can't square this with the use of capital P. I think it's important to look at. I mean, the other side suggests that this is how Phillips understood the concept from the very beginning. That's just not correct. If you look at the one page memo that Murphy cited at page 1060, that is a memo before the template license was even sent to Lily. And it is a memo recounting what Lily had said in an oral conversation. They wanted to get out of this negotiation. It's not it was not Phillips's position. And that's made clear in the Richmond Declaration. That's begins, I think, on page 18 of the supplemental excerpts. What the Richmond Declaration explains is that Phillips had strong and well-established licensing policy that royalties needed to be paid on the end product. Or in this under a license like this one, if it were bulk product, which is something that needs further transformation before it's ready to be packaged up into a pharmaceutical, you could get royalties on bulk product. And I think that's a that's a real problem with the other sides, with the other side's view. Ms. Murphy answered, I think, answered your question to say that, yes, you could have reagent that's used to make end product. But I think they still have the null set problem because what what she's just the way in which she answered that question, everything that she gave, every answer that she gave, I think, would already be bulk product. There's no answer. There's nothing in their position that would acknowledge that. The hypothetical was that the same expression system would produce a precursor and a reagent. The reagent would then be used on the precursor to clip out things as done here. And then you while you get the ultimate pharmaceutical and her argument is that that shows that the clause in reagent is not, you know, surplusage because that would be covered by that. And what's your response to that? So, I mean, I agree that that would be covered, but I don't agree that that's the only thing that would be covered. Because that requires, one, a specialized meaning of produced by. So in other words, that the that only the precursor winds up triggering the product definitions. And two, it would allow for the use of reagent to make lowercase p products without without providing such a grant expressly. In other words, it would take away what Phillips negotiated for and provided meaningful concessions for in terms of the royalty term. Then I'm not sure I'm following. I don't see how that reading of the definition of reagent is covering that kind of dual production. Hypothetical means that this was what they actually did was authorized. Oh, no, I'm not. I'm not purporting to speak to to that. I am just trying to explain why. Because it seems that under that narrow reading of the reagent clause, what was done here was plainly unauthorized by the license. Well, if if this is not a capital P product because of a death, because the the definition of capital P product of end product is narrow enough that it requires that it actually be emitted from an expression system. That that that would be the consequence. But what we're what we're urging is that because reagent was admittedly put out into its own category, but that final the definition of product ultimately wasn't changed from the original template license, that the same meaning of produced by should control which contemplated that an expression system would produce things that were not a finished product were not that would require refinement or processing, chemical transformation or other things before they could be made into into a finished product. And what the other side is trying to narrow that in a in a way that doesn't correspond to either the ordinary meeting with the structure to say that the only way in which the end product can be produced by the reagent that comes out of the system is in that narrow chemical sense. I don't think certainly the the example that they've given does not from the negotiating history doesn't say that that's what it means. They didn't use technical terms and they didn't adopt, for example, FDA lingo, because this is, after all, a license that extends beyond just pharmaceutical technology. There are other uses as well. If they'd meant to use a technical term, they would have done so. But this is you know, this is from Phillips's template license produced by. Unless the court has any further questions. All right. Thank you, counsel. Thank you, Your Honor. So I think a core of the textual argument you're hearing here rests on a logical fallacy. Essentially, they say that because the agreement covered only the use of reagent to make capital P product, it must be that any time we were using reagent, we were making capital P product. That just doesn't follow, as I think some of the questioning is revealed. It it could simply be that the parties weren't careful in drafting a suggestion that the two phrases need to be read in paramateria. And so that the the reference to, you know, producing to using reagent and the manufacturer development of product tells us something about what produced by means. I don't think it can get you the point of telling you that produced by when it says produced by an expression system actually means manufactured using PICCIA based technology, because then you're just collapsing the definition of reagent into the definition of capital P of end product. And it's really not making sense why you had two distinct things here. And there I would I would take you back to this historical notion of what the parties were getting at. You know, if you look at that memorandum that we were talking about, I think the really important part of it is it when you're when this is a 1060 of the record, when we say to them we're interested in using reagent and want to know how that would be paid for under this agreement. Their internal response is not to say we're not sure why they're worried about this, because, of course, if they're using reagent, they're necessarily making product. And it's already subject to a two percent royalty. Their internal response says exactly the opposite. It says we raise the question, how would we pay for royalties on something that we developed as a reagent which was never part of the final product? And then they posit that a pass through to end product would not be applicable. They don't say, of course, that would be product. Why are you bothering with this? They invited us to introduce into the agreement a scheme for compensating the use of reagent. None of that makes any sense if they actually understood if everybody really knew from the start that using reagent was always going to produce product. Now, of course, if you're getting to the point of looking at the drafting history, then you necessarily have concluded that there's ambiguity here. And if you think there is ambiguity here, then you can't affirm what the district court held here, which is that there are readings. What's your response to their point that if you view this as an authorized use of reagent, but one that doesn't produce a finished product? Whereas here, it actually costs more to use the reagent. Sure. Nothing. Yeah. And I think this goes to the point. First, they don't get a reasonable. They don't get enough because we paid for this technology in the first instance. And then we owe them maintenance every year that we are using it. So if it doesn't reach if the if the maintenance fee is lower than royalties or end product, we still have to pay them every year. Now, I would also say that I just don't think it's terribly surprising that the parties were not necessarily contemplating at the time that we might use PICA based reagent in a way that didn't save us any money. And I think if Phillips had said, well, if you do that, we also want you to pay us. We would have said, well, wait a second, if you're picky, it is not actually generating any revenue for us. Why would we be paying you royalties or a percentage of anything? We're not getting new revenue by use of it. So it makes sense that that is just not something the parties would have contemplated at the time that they needed to think about the unusual situation we find ourselves in where we were using it, even though it wasn't cheaper than the way that we had been producing these drugs long before PICA came on the scene. Thank you, counsel. The case just argued be submitted and thank counsel on both sides for the very helpful arguments in this case.
judges: COLLINS, MENDOZA, DESAI